IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| TYRONE HOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, KENNETH | ) | |
| BOUDREAU, JOHN HALLORAN, BERNARD | ) | |
| RYAN, ROBERT LENIHAN, JOHN | ) | |
| POLUSZNY, MICHAEL CLANCY, JOHN | ) | |
| BALL, JAMES O'BRIEN, GERALD | ) | JURY TRIAL DEMANDED |
| CARROLL, ELIZABETH SHINN, JOHN | ) | |
| STOUT, AND UNKNOWN EMPLOYEES OF | ) | |
| THE CITY OF CHICAGO, | ) | |
| | | |
| Defendants. | | |

## COMPLAINT

NOW COMES Plaintiff, TYRONE HOOD, by and through his
attorneys, LOEVY & LOEVY, and complaining of KENNETH BOUDREAU,
JOHN HALLORAN, BERNARD RYAN, ROBERT LENIHAN, JOHN POLUSZNY,
MICHAEL CLANCY, JOHN BALL, JAMES O'BRIEN, GERALD CARROLL,
ELIZABETH SHINN, and UNIDENTIFIED EMPLOYEES OF THE CITY OF
CHICAGO (collectively "Defendant Officers"), and THE CITY OF
CHICAGO (hereinafter "City"), alleges as follows:

## Introduction

1. Plaintiff, Tyrone Hood, was convicted of a murder that
he did not commit. Arrested in the prime of his life, Plaintiff
spent over two decades in prison before he was ultimately
exonerated.

2.     Plaintiff was convicted after the Defendant Officers engaged in a tapestry of egregious wrongdoing, including fabricating evidence, threatening witnesses and withholding exculpatory evidence in an effort to shortcut the investigatory process and frame Plaintiff for a crime for which he was completely innocent.

3.     Meanwhile, the Defendants ignored compelling evidence that another individual – the victim's estranged father, Marshall Morgan, Sr. – actually committed the crime. Unlike Plaintiff, Morgan, Sr. had a motive and a *modus operandi* of committing similar murders. Morgan, Sr. had recently taken out a life insurance policy on his son and had a history of killing loved ones for financial gain. As far back as 1977, Morgan, Sr. was convicted of killing a close friend over a debt. In 1995, after his son's murder, Morgan, Sr. was suspected in the murder of his fiancé, Michelle Soto, and he was ultimately convicted of the 2001 murder of his girlfriend, Deborah Jackson.

4.     Never giving up on proving his innocence, Plaintiff worked tirelessly inside and outside the courts to show that he had absolutely nothing to do with this crime. On January 12, 2015, after being presented with overwhelming evidence of Plaintiff's innocence, Governor Pat Quinn commuted Plaintiff's sentence and he was released from prison days later. Just one month after, on February 9, 2015, the State dismissed all

2

charges against Plaintiff. This lawsuit seeks redress for his injuries.

## Jurisdiction

5.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

6.    This Court has jurisdiction for Plaintiff's constitutional claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction his state law claims pursuant to 28 U.S.C. §1367. Venue is proper under 28 U.S.C. § 1391(v). The events giving rise to this complaint occurred in this judicial district.

## The Parties

7.    Tyrone Hood is a 52 year-old father of three. He is a high school graduate who was working various jobs, including in construction and as a mechanic, prior to his arrest. During his wrongful incarceration, Mr. Hood continued to work inmate jobs in the kitchen, laundry and as a textile worker.  Since his release from prison and exoneration, he has been employed by Pace Bus Services as a sign and shelter technician.

8.    At all times relevant hereto, Defendants Kenneth Boudreau, John Halloran, Bernard Ryan, Robert Lenihan, John Poluszny, Michael Clancy, John Ball, James O'Brien, Gerald Carroll, John Stout, Elizabeth Shinn and other unidentified

employees of the Chicago Police Department ("Defendant Officers") were police officers or otherwise employed by the Chicago Police Department. All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation of the murder at issue.

9.    Defendant City of Chicago is an Illinois municipal corporation. The City of Chicago is or was the employer of each of the Defendant Officers.

**The Crime**

10.  On or about May 8, 1993, 20 year-old Marshall Morgan, Jr. disappeared. Morgan, Jr. was a college student at Illinois Institute of Technology and a standout basketball player.

11.  On or about May 15, 1993, Morgan, Jr.'s body was found inside his abandoned car. He was nude except for a black-and-white t-shirt, and his body was wedged between the front and back seats of the car.

12.  There was a large amount of litter found inside the car, including but not limited to beer cans and bottles, and a prisoner property envelope with the name "Laron Hyde" on it. Morgan, Jr.'s checkbook was also found inside the vehicle, along with $17 in cash.

13.  The medical examiner determined that Morgan, Jr. died from three gunshot wounds from a .38 caliber gun.

14.  Morgan's disappearance and murder were highly publicized in the media, as Morgan was known as a local basketball star.

### Marshall Morgan, Sr.

15.  One of the last people to see Morgan, Jr. alive was his estranged father, Marshall Morgan, Sr. The victim, Morgan, Jr., had allegedly gone to see Morgan, Sr. at Corliss High School, where he was working as a janitor on the day his son disappeared.

16.  Morgan, Sr. had only recently come back into his son's life, after an absence of seventeen years.

17.  Shortly after he reappeared, Morgan, Sr. took out a life insurance policy on his healthy twenty-year old son. At the same time as he did so, Morgan, Sr. was facing a mounting financial crisis of his own. He declared in court filings that he was destitute, his house was in foreclosure and he was being sued for child support.

18.  Just five months after Morgan, Sr. took out a life insurance policy on him, Morgan, Jr. was found dead. Morgan, Sr. collected nearly $50,000 on the policy.

19.  This was neither the first nor the last time Morgan, Sr.'s loved ones would be killed over money. In 1977, Morgan Sr. shot and killed his close friend over a $700 debt. Morgan, Sr. was convicted of voluntary manslaughter.

5

20.  In 1995, while Plaintiff was awaiting trial, Morgan, Sr.'s then-fiancé, Michelle Soto, was shot and killed. Her nude body was wedged between the front and back seats of her abandoned car. Just months before her death, Morgan, Sr. took out a life insurance policy on Soto. After her death, Morgan, Sr. collected over $100,000 on that policy. He also fraudulently transferred the deed to her house into his name.

21.  In 2001, Morgan, Sr.'s then-girlfriend, Deborah Jackson, was shot and killed, her partially nude body left inside the trunk of her abandoned car. Just prior to her death, she and Morgan, Sr. had been arguing over $25,000 that she allegedly took from him. Morgan, Sr. confessed to killing his girlfriend and he was convicted and sentenced to 75 years in prison for her murder.

22.  By contrast, at the time of Marshall Morgan, Jr.'s murder, Tyrone Hood was a devoted father and husband, with only a misdemeanor to his name. Plaintiff never met Morgan, Jr. and had absolutely nothing to do with his death.

### The Police Investigation

23.  Morgan, Jr.'s murder was a "heater" case in Chicago. There was significant media attention and pressure to solve the case.

24.  Rather than focus on compelling suspects – like Morgan, Sr. – the Defendant Officers short-circuited the

criminal investigation, coercing witnesses and fabricating evidence in an effort to unlawfully target Plaintiff and his co-defendant, Wayne Washington.

25. According to the Defendant Officers, they began searching for Plaintiff because they allegedly found his fingerprints on two beer bottles located amidst the trash someone had strewn inside Morgan, Jr.'s car. However, Defendants did not receive the identification of those prints until after Plaintiff was taken into custody, and not before.

26. For two days – from May 20, 1993 through May 22, 1993 – Plaintiff was in police custody. During this time, he was repeatedly interrogated, coerced and beaten by the Defendant Officers.

27. During those interrogations, the Defendant Officers fabricated statements and attributed them to Plaintiff, including that he had touched various alcohol bottles, that he had been in the neighborhood where Morgan, Jr.'s car was found, and that he gave allegedly inconsistent alibis for the time period surrounding Morgan, Jr.'s disappearance. None of those statements were true.

28. The Defendant Officers also claimed that while in custody, Plaintiff made a purportedly incriminating statement, to wit, "If I don't say anything to explain, I will go to jail for a long time. If I do tell what happened, I will go to jail,"

7

or words to that effect. That statement was wholly fabricated by the Defendant Officers.

29.  All of the evidence that the Defendant Officers fabricated while Plaintiff was in custody was introduced and used against Plaintiff at his criminal trial.

30.  After two days in police custody, Plaintiff was released. The Defendant Officers had no probable cause to hold him any longer or to charge him with a crime.

31.  Five days later, however, the Defendant Officers again arrested Plaintiff and subjected him to another round of interrogations. The Defendant Officers also took Plaintiff's co-defendant, Wayne Washington, into custody at this time. Both were arrested at a corner store and taken to the Area One Detective Division ("Area One").

32.  Once there, Plaintiff again denied having anything to do with the murder. Unwilling to heed his protestations of innocence and unwilling to continue their investigation into other possible suspects, the Defendant Officers instead focused on coercing witnesses and fabricating additional evidence to pin the murder on Plaintiff.

33.  Notably, the Defendant Officers used physical violence against Wayne Washington, including punching and slapping him while he was handcuffed, until he agreed to sign a confession that was absolutely false. Washington was kept in custody for

8

two days. None of that coercion was ever disclosed to the prosecution, Plaintiff or his criminal defense attorney.

34.   Moreover, in the resulting false confession, the Defendant Officers fabricated the fact that Plaintiff brought Washington a black hooded sweatshirt after he and Washington had shot and killed Morgan, Jr. The Defendant Officers then went to Washington's house and allegedly recovered a black sweatshirt, which they claimed was Morgan, Jr.'s. That sweatshirt – as well as the Defendant Officers' retrieval of the sweatshirt from Washington's home after Washington gave a statement – was introduced at Plaintiff's trial and used to falsely convict him.

35.   In addition to Wayne Washington, the Defendant Officers coerced Joseph West into falsely implicating Plaintiff. Notwithstanding the fact that West knew nothing about the crime, the Defendant Officers made it clear that he would not be released from custody unless he implicated himself or Plaintiff in the crime. As a result, West fabricated a statement falsely inculpating Plaintiff. The Defendant Officers never disclosed to the prosecutor or to Plaintiff or his criminal defense attorney the manner in which they coerced West.

36.   Finally, the Defendant Officers coerced Jody and Michael Rogers into falsely implicating Plaintiff and Washington in the crime.

37.   Jody and Michael Rogers were brothers who lived in the neighborhood; neither knew anything about the murder of Morgan, Jr. The Defendant Officers interrogated Jody over the course of two days. During that time, the Defendant Officers threatened to charge him with murder, threatened him with physical harm and physically beat him. Tired, scared, and wanting to go home, Jody gave a statement inculpating Plaintiff and Washington that was fabricated and false. The Defendant Officers never disclosed to the prosecution or to Plaintiff or his criminal defense attorney the manner in which they coerced Jody.

38.   Michael also knew nothing about the murder of Marshall Morgan, Jr. and told the Defendant Officers as much. Nonetheless, the Defendant Officers falsely reported that Michael provided them with the same account of Plaintiff's and Washington's culpability as his brother, Jody. The Defendant Officers induced Michael to testify consistent with his brother by providing him with financial and other benefits. None of those benefits were ever disclosed to the prosecutor or to Plaintiff or his criminal defense attorney.

### The Police Investigation Falls Apart

39.   Built on lies, the Defendant Officers' investigation began to crumble even before Plaintiff's trial commenced.

40.   Every single witness that the Defendants had coerced into giving false statements and confessions recanted.

41.   Joseph West disavowed his statement to the police and his testimony before the grand jury, both of which inculpated Plaintiff, explaining that he was coerced by the Defendant Officers into falsely implicating Plaintiff.

42.   Jody Rogers similarly recanted his statement to the police and his testimony before the grand jury, explaining that both were a by-product of the Defendant Officers' coercion.

43.   Jody's brother, Michael, did the same, admitting that he knew nothing about Morgan, Jr.'s murder or Plaintiff's involvement in it.

### The Defendant Officers Unlawfully Induce a Witness to Identify Plaintiff

44.   As a result, on the eve of trial, there was little, if anything, to connect Plaintiff to the murder of Marshall Morgan, Jr.

45.   Fearing their case had fallen apart, the Defendant Officers went out and found their eleventh hour witness: Emanuel Bob. Bob testified that three years prior, on the night before Mother's Day, he saw Plaintiff drive up to Bob's girlfriend's home in the victim's car, from a second story window with a view obstructed by a tree. He stated that Washington then approached Plaintiff and the car.

46.   Bob's testimony was false and fabricated; he never reported this alleged sighting in the three years that passed

11

between the crime and Plaintiff's trial because it never happened. Instead, the Defendant Officers unlawfully induced Bob into identifying the victim's car, Plaintiff and Washington by feeding information to him and subjecting him to an unduly suggestive photo array that contained only a photograph of Plaintiff, a photograph of Washington and two photographs of the victim's car. That unlawfully induced identification was introduced at Plaintiff's trial and used to convict him.

47.  Indeed, Bob has admitted that he did not know Plaintiff or Washington, and that he never saw Plaintiff inside the victim's car on the night before Mother's Day. Despite being obviously exculpatory, the Defendant Officers never disclosed that information to the prosecution or defense.

48.  Moreover, after showing Bob the photo array, the Defendant Officers lost or destroyed it along with any related police reports memorializing the array. The Defendant Officers have offered no explanation for having lost or destroyed such material evidence.

49.  Destroying the array, however, enabled the Defendant Officers to claim that the array was not unduly suggestive when it was. For example, the Defendant Officers fabricated reports and falsely alleged that they had shown Bob photographs of multiple black males when in fact they had only shown him a picture of Plaintiff and his co-defendant.

50.   In addition to Bob, on the eve of trial, the
prosecutor offered Jody a deal on his then-pending charge in
exchange for testifying against Plaintiff. Jody took the deal
and testified against Plaintiff; Michael also recanted his
recantation and testified consistent with his brother.

### Plaintiff's Wrongful Conviction

51.   On May 7, 1996, based on the Defendants' fabricated
evidence and the unlawfully induced and coerced testimony of
witnesses, including but not limited to that of Michael and Jody
Rogers, and Emanuel Bob, Plaintiff was wrongfully convicted of
murder.

52.   During Plaintiff's criminal proceedings, the Defendant
Officers committed perjury, for example, by denying they
committed any misconduct and testifying to statements that
Plaintiff never made.

53.   Without the Defendants' misconduct, Plaintiff never
would have been arrested, let alone convicted.

54.   During his sentencing, Plaintiff maintained his
innocence. As he explained to the Judge:

> I have said many times before and again that I am
> totally innocent of this case  . . . .
>
> At times during the day and night I pray that the
> truth will come out. In the bible in Luke, Chapter
> Eight verses seventeen to eighteen, it says whatever
> is covered up will be uncovered and whatever is hidden
> will be found, therefore, consider carefully how you
> listen.

> I say to myself, [Tyrone], they will find out that I'm
> an innocent man, just have patience for the Lord to
> help you . . . .

55.   Plaintiff was sentenced to 75 years in prison.

### Plaintiff's Exoneration

56.   Never giving up on proving his innocence, in 2015, Plaintiff was finally exonerated. On January 12, 2015, Governor Pat Quinn commuted Plaintiff's sentence. A spokesperson for Governor Quinn explained that "[w]hile it has been rare for Governor Quinn to commute a sentence, the governor was compelled to act after learning details of this case."

57.   Less than one month later, on February 9, 2015, the State dismissed all charges against Plaintiff in a manner indicative of his innocence.

### Chicago's Practice of Coercing False Statements

58.   The constitutional violations that caused Plaintiff's wrongful conviction were not isolated events.  To the contrary, they were the result of the City of Chicago's policies and practices of pursuing wrongful convictions through reliance on coerced statements and profoundly flawed investigations.

59.   The Defendant Officers' coercion of false statements from Plaintiff's co-defendant and each of the witnesses in this case was undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Department.

60. In an article examining thousands of murder cases in Chicago from 1991 through 2000, *The Chicago Tribune* found that Chicago police detectives had been involved in a wide range of cases that ultimately collapsed even though the detectives had obtained confessions.

61. That article specifically examined inculpatory statements taken by Defendant Boudreau. According to the Tribune's survey, "Boudreau stands out not only for the number of his cases [with confessions] that have fallen apart, but for the reasons." For example, in those cases, Boudreau has been accused by defendants of punching, slapping or kicking them, just as he did with Washington and the witnesses here.

62. In total, Defendant Boudreau managed to obtain murder confessions from more than a dozen people in which the charges were either dropped or the defendant was acquitted notwithstanding the supposed confessions. Likewise, he has obtained coerced inculpatory statements from witnesses to corroborate those false confessions.

63. For a two-year period in the early 1990s, for example, Defendant Boudreau and his partner, Defendant Halloran helped "solve" at least five murders with "confessions" that ended with acquittals. All of these suspects alleged that Boudreau and/or Halloran mistreated them to obtain false confessions.

15

64.  Defendant Boudreau's and Halloran's misconduct in soliciting false "confessions" and witness statements were just two of the more prominent examples of the widespread policy and practice within the Department.

65.  The wrongful convictions of innocent persons involving coerced and false statements include numerous cases in which Department detectives used the very same tactics that the Defendants employed against Plaintiff, his co-defendant and the witnesses in this case.  These tactics include: (a) physical abuse; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (e) concealment of exculpatory information; (f) false promises of leniency in exchange for "cooperation" in the form of a statement; and (g) use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons without regard to their actual guilt.

66.  Consistent with the municipal policy and practice described in the preceding paragraph, members of the Department, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced statements, both from the Cook County State's Attorney's Office and from criminal defendants.

67.  As a matter of both policy and practice, municipal policy makers and Department supervisors condoned and facilitated a code of silence within the Chicago Police

Department.  In accordance with this code, Department detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

68.  As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining coerced and false statements, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, Chicago police officers (including the Defendant Officers here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

69.  The City's failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case.  Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

17

70.   The City of Chicago and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

71.   The policies and practices described in the foregoing paragraphs were consciously approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

### Chicago's "Street Files" Practice

72.   In addition, the unconstitutional withholding of exculpatory information from Plaintiff's defense in this case was undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Department.

73.   Specifically, at all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, systematically suppressed *Brady* material by intentionally secreting discoverable information in the clandestine files commonly referred to as "street files."

74.   Based on information and belief, it was the Department's policy and practice to keep a secret set of "street files" that are maintained in the basement of Areas One and Three and at Chicago Police Department Headquarters, among other

locations. These files are not inventoried and are instead kept in a file cabinet that purportedly contains "open" police investigations.

75. As a matter of widespread custom and practice, these clandestine street files were routinely withheld from the Cook County State's Attorney's Office and from criminal defendants, and some of these files may have been subsequently destroyed.

76. Consistent with the municipal policy and practice described in the preceding paragraphs, Defendants in this case concealed exculpatory evidence, including evidence relating to the Rogers brothers and Emanuel Bob, including any reports documenting the photo array Defendant Officer showed Bob in street files, which were never disclosed to Plaintiff's criminal defense team or the prosecutors.

77. The street files practice described in the preceding paragraphs was consciously approved at the highest policy-making level for decisions involving the Department, and was a cause of the injuries suffered here by Plaintiff.

78. The street files practice described in the preceding paragraphs was enjoined by court order and supposedly discontinued prior to the investigation of Marshall Morgan, Jr.'s murder. Contrary to the Department's public pronouncements, however, the street files practice continued through and including the investigation into Marshall Morgan,

Jr.'s murder, directly causing a violation of Plaintiff's rights.

## Plaintiff's Damages

79. Plaintiff spent over 20 years in prison for a crime that he did not commit. Plaintiff must now attempt to make a life for himself outside of prison without the benefit of two decades of life experiences, which normally equip adults for that task.

80. Additionally, the emotional pain and suffering caused by losing 20 years in the prime of his life — from ages 29 to 51 — has been substantial. During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to raise his children, share holidays, births, funerals and other life events with loved ones, and on the fundamental freedom to live one's life as an autonomous human being.

81. As Plaintiff explained during his sentencing:

The fact is I'm a simple devoted husband and father to my kids. I know they miss me taking them places, helping them with their homework. They ask me over and over, daddy, when are you going to come home and as they tell me this I have to lower my head and hide the tears because it hurts and I have no answer for them . . . .

20

82.  Plaintiff's two decades of wrongful incarceration forced him into a world of isolation in which he lost all contact with his friends and family in the outside world.

83.  As a result of the foregoing, Plaintiff has suffered tremendous damage, including physical sickness and injury, and emotional damages, all caused by the Defendants' misconduct.

**COUNT I – 42 U.S.C. § 1983**
**Violation of Due Process**

84.  Each paragraph of this Complaint is incorporated as if restated fully herein.

85.  As described more fully above, all of the Defendant Officers, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

86.  In the manner described more fully above, the Defendant Officers, individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence, deliberately withheld exculpatory evidence, destroyed and/or intentionally lost material evidence, and used unduly suggestive identification procedures. In doing so, the Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, to

preserve material evidence and to ensure the integrity of eyewitness identifications.

87.  The destruction or loss of evidence was done in bad faith, and/or was done so that Plaintiff could not present obviously exculpatory evidence at trial.

88.  Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been convicted.

89.  The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the United States Constitution.

90.  As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical sickness and injury, and emotional distress.

91.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT II – 42 U.S.C. § 1983
### Failure to Intervene

92. Each paragraph of this Complaint is incorporated as if restated fully herein.

93. In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

94. As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical sickness and injury, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

95. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT III – 42 U.S.C. § 1983
## Federal Malicious Prosecution[1]

96.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

97.   Defendant Officers caused Plaintiff to be unreasonably seized and further caused Plaintiff to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of his innocence.

98.   The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

99.   Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. In so doing, the Defendant Officers fabricated evidence, withheld exculpatory information, used unduly suggestive identification procedures to

---

[1]   Plaintiff is including this claim in his Complaint to preserve it in the event that the Supreme Court decides that there is a federal malicious prosecution claim, *see Manuel v. City of Joliet et. al.*, No. 14-9496, 2016 WL 205942 (U.S. Jan. 15, 2016), or the Seventh Circuit overturns its ruling in *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001).

24

induce a false identification of Plaintiff, and destroyed and/or lost material and exculpatory evidence.

100. The misconduct in this Count violated Plaintiff's rights under the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

101. The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference.

102. The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described above.

103. As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including physical injury and sickness, and emotional pain and suffering.

## COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

104. Each paragraph of this Complaint is incorporated as if restated fully herein.

105. After the murder of Marshall Morgan, Jr., the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

25

106. Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

107. In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

108. In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence, withholding exculpatory evidence, coercing false statements, using unduly suggestive identification procedures, and committing perjury during hearings and trials – and was an otherwise willful participant in joint activity.

109. As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical sickness, and emotional distress.

110. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

26

## COUNT V – 42 U.S.C. § 1983
## Municipal Liability

111. Each paragraph of this Complaint is incorporated as if restated fully herein.

112. The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included but were not limited to the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.

113. The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

114. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

115. The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

## COUNT VI – State Law Claim
## Malicious Prosecution

116. Each paragraph of this Complaint is incorporated as if restated fully herein.

117. The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

118. The Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

119. Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. The Defendant Officers also fabricated evidence, coerced false inculpatory statements from Plaintiff's co-defendant and witnesses, withheld exculpatory evidence that would have demonstrated Plaintiff's absolute innocence, destroyed material and/or exculpatory evidence and used unduly suggestive identification procedures. The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Morgan, Jr. murder.

120. The Defendant Officers intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual

perpetrator. The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

121. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

122. On February 9, 2015, the prosecution terminated in Plaintiff's favor when his conviction was vacated and all charges against him were dismissed.

123. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including physical sickness and injury, and emotional distress.

### COUNT VII – State Law Claim
### Intentional Infliction of Emotional Distress

124. Each paragraph of this Complaint is incorporated as if restated fully herein.

125. The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

126. As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer physical sickness and severe emotional distress.

### COUNT VIII – State Law Claim
### Civil Conspiracy

127. Each paragraph of this Complaint is incorporated as if restated fully herein.

128. As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

129. In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

130. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

131. As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including physical sickness and severe emotional distress, as is more fully alleged above.

**COUNT IX – State Law Claim**
**Respondeat Superior**

132. Each paragraph of this Complaint is incorporated as if restated fully herein.

133. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Department, acting at all relevant times within the scope of their employment and under color of law.

134. Defendant City of Chicago is liable as principals for all torts committed by its agents.

**COUNT X – State Law Claim**
**Indemnification**

135. Each paragraph of this Complaint is incorporated as if restated fully herein.

136. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

137. The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, TYRONE HOOD, respectfully requests that this Court enter judgment in his favor and against Defendants, KENNETH BOUDREAU, JOHN HALLORAN, BERNARD RYAN, ROBERT LENIHAN, JOHN POLUSZNY, MICHAEL CLANCY, JOHN BALL, JAMES

O'BRIEN, GERALD CARROLL, JOHN STOUT, ELIZABETH SHINN, UNKNOWN
EMPLOYEES OF THE CITY OF CHICAGO, and THE CITY OF CHICAGO,
awarding compensatory damages, attorneys' fees, and costs
against each Defendant, and punitive damages against each of the
individual Defendants, as well as any other relief this Court
deems appropriate.

**JURY DEMAND**

Plaintiff, TYRONE HOOD, hereby demands a trial by jury
pursuant to Federal Rule of Civil Procedure 38(b) on all issues
so triable.

Respectfully submitted,


/s/Heather Lewis Donnell


Jon Loevy
Gayle Horn
Roshna Bala Keen
Heather Lewis Donnell
Elizabeth Mazur
LOEVY & LOEVY
312 N. May St, Suite 100
Chicago, IL 60607
P: (312) 243-5900
F: (312) 243-5902