**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WAYNE WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-1893 |
| | ) | |
| v. | ) | Judge John F. Kness |
| | ) | Magistrate Judge Maria Valdez |
| KENENTH BOUDREAU, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | JURY TRIAL DEMANDED |

_____

| | | |
|---|---|---|
| TYRONE HOOD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16 CV 1970 |
| | ) | |
| v. | ) | Judge John F. Kness |
| | ) | Magistrate Judge Maria Valdez |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION TO BAR DR. BRIAN CUTLER**

## <u>TABLE OF CONTENTS</u>

I.     Cutler's Expert Testimony About the Photographic Identifications is Relevant................1

II.    Dr. Cutler's Opinions About Contamination, Confirmation Bias and Commitment Effect Are Reliable .......................................................................................................................3

      A.    Dr. Cutler's Explanation of the Factors That May Have Impacted Mr. Bob's and Ms. Cage's Identifications is Reliable and Admissible ...........................................3

      B.    Dr. Cutler's Opinions About Confirmation Bias Are Not Based on Speculation ..5

      C.    Dr. Cutler's Opinions on Contamination and the Commitment Effect Are Reliable ..............................................................................................................................6

      D.    Dr. Cutler's Opinions About Showing the Witnesses a Photograph of the Car with a Police Officer in the Photograph is Reliable ..........................................................7

III.    Dr. Cutler's Opinions on Impoverished Viewing Conditions are Reliable .......................8

      A.    Dr. Cutler Based His Opinions About Impoverished Viewing Conditions on Facts in the Record ...............................................................................................................8

      B.    There is a Scientific Foundation for Dr. Cutler's Opinions...................................10

IV.    Dr. Cutler's Opinions on Inference Processing are Relevant ...........................................11

V.     Dr. Cutler Can Testify About the Length of Time Between the Alleged Sightings and Identifications .................................................................................................................13

VI.    Dr. Cutler's Opinions About Confidence Level Are Supported by the Research ............15

VII.   Dr. Cutler's Rebuttal Opinion is Admissible....................................................................16

VIII.  Dr. Cutler's Report Should Not Be Barred Based on Rule 403........................................18

CONCLUSION...................................................................................................................19

## **TABLE OF AUTHORITIES**

*Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 3988593 (N.D. Ill. Aug. 30, 2022).........19

*Cage v. City of Chicago*, 979 F. Supp. 2d 787 (N.D. Ill. 2013)............................................ *passim*

*Cage v. City of Chicago*, No. 09 C 3078, 2012 WL 5557410 (N.D. Ill. Nov. 14, 2012) .............17

*Chapman v. Maytag Corp.,* 297 F.3d 682 (7th Cir. 2002)............................................................16

*Gillispie v. City of Miami Township*, No. 3:13-CV-416, 2022 WL 14758379 (S.D. Ohio Oct. 26, 2022) ..........................................................................................................................................3

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) ............................................................8

*Parish v. City of Elkhart*, 702 F.3d 997 (7th Cir. 2012) ...........................................................2, 7

*Phillips v. Allen*, 668 F.3d 912 (7th Cir. 2012)............................................................................14

*Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097 (N.D. Ill. May 17, 2016) ...........................................................................................................................................1, 15

*Sanders v. City of Chicago Height*s, No. 13 C 0221, 2016 WL 1730608 (N.D. Ill. May 2, 2016) .........................................................................................................................................19

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000) ...................................................... *passim*

*United States v. Northrup Grumman Sys. Corp.*, 2015 WL 5916871 (N.D. Ill. Oct. 8, 2015)......12

*U.S. v. Williams*, 522 F.3d 809 (7th Cir, 2008)............................................................................14

The Defendants have sought to bar testimony from Dr. Brian Cutler, Plaintiffs' eyewitness identification expert. The Defendants do not challenge Dr. Cutler's credentials, but instead argue that his testimony is unreliable because he does not reach definitive conclusions about whether certain factors—viewing conditions, the suggestive procedures used for the identification, and post-event information—impacted the identifications of Plaintiffs and the victim's car made by Emanuel Bob and Brenda Cage. In short, Defendants complain that Dr. Cutler should have made state-of-mind opinions about what Mr. Bob and Ms. Cage were thinking when they identified Plaintiffs and the victim's car, and credibility determinations about whether Mr. Bob and Ms. Cage were lying when they made those identifications. This is obviously not the role of an expert. Defendants' motion should be denied.

## I.    Cutler's Expert Testimony About the Photographic Identifications is Relevant

The Defendants argue that because the Court dismissed the suggestive identification claim at summary judgment, Dr. Cutler's testimony (and presumably their own eyewitness expert's testimony) is irrelevant. Doc. 604 at 5. The Defendants do not cite any cases to support this proposition, likely because there are none. Rather, given the fact that the Defendants not only intend to introduce Mr. Bob's and Ms. Cage's identifications of Plaintiffs and the victim's car, but also are arguing that Plaintiffs are guilty of the murder of Marshall Morgan, Jr., Dr. Cutler's eyewitness expert testimony is relevant and admissible.

"When analyzing the relevance of proposed expert testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of *any* of the issues involved in the case." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 843 (N.D. Ill. 2013) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (emphasis in original); *see also Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *4, 8 (N.D. Ill.

1

May 17, 2016). "The expert need not have an opinion on the ultimate question to be resolved by the trier of fact in order to satisfy this requirement." *Smith*, 215 F.3d at 718. As such, the test is not—as the Defendants have argued—whether there is a suggestive identification claim still extant in the case. Instead, the question is whether Dr. Cutler's testimony will help the jury analyze "any of the issues involved in the case." *Id*. On that score, the answer is clearly yes.

In particular, in the upcoming trial, a jury will not only be asked to determine whether the Defendants violated Plaintiffs' constitutional and state-law rights, but also whether Plaintiffs are entitled to damages. That latter inquiry hinges on the jury's assessment of whether Plaintiffs are innocent. *See Parish v. City of Elkhart*, 702 F.3d 997, 999-1001 (7th Cir. 2012) (explaining that evidence of innocence is relevant to damages). To the extent that the Defendants are seeking to introduce Bob's and Cage's identifications of Plaintiffs and the victim's car to inculpate Plaintiffs in Morgan, Jr.'s murder, Plaintiff should be able to introduce Dr. Cutler's opinions to help the jury analyze those identifications. *Parish*, 702 F.3d at 1001 (finding it error to "prohibit[] evidence establishing the unreliability of the eyewitness identification as to the perpetrators of the crime . . . ."); *see also Jones*, 514 F. Supp. 3d at 863-64 (agreeing that eyewitness expert "Dysart's opinion is relevant to show Plaintiff's innocence of the crimes for which he was convicted, which bears on the issue of damages"). In short, Dr. Cutler's testimony is necessary for Plaintiffs to explain that Mr. Bob's and Ms. Cage's identifications were made not because either witness saw the Plaintiffs (or the victim's car), but instead because of other factors, including that their memories were contaminated by news reports and the procedures used to procure their identifications were unduly suggestive. *See* Doc. 589 at 54 ("But whether the circumstances under which the Officer Defendants procured identification evidence—such as Bob's identifications of Plaintiffs at night from a (disputed) distance away (Dkt. 558 ¶¶

183−86)—were sufficiently coercive is a question of fact that cannot be resolved on the present motion.").

## II. Dr. Cutler's Opinions About Contamination, Confirmation Bias and Commitment Effect Are Reliable

The Defendants fare no better in arguing that Dr. Cutler's opinions about contamination, confirmation bias and the commitment effect are unreliable. In large measure, this argument boils down to Defendants' misunderstanding about the scope of expert testimony. As Defendants would have it, because Dr. Cutler cannot state that each of these phenomena definitively impacted Mr. Bob's or Ms. Cage's identifications, his testimony is "speculative" and should be barred. That, however, misses the mark: Dr. Cutler's testimony helps the jury understand the different factors that may have impacted the witnesses' identifications. It is then up to the jury to determine whether they did.

### A. Dr. Cutler's Explanation of the Factors That May Have Impacted Mr. Bob's and Ms. Cage's Identifications is Reliable and Admissible

"Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert*'s relevancy requirement." *Smith*, 215 F.3d at 718-19; *see also Gillispie v. City of Miami Township*, No. 3:13-CV-416, 2022 WL 14758379, at *4 (S.D. Ohio Oct. 26, 2022) ("The Court will allow Dr. Dysart to testify as to the general principles of eyewitness identifications and contamination by third parties . . . For instance, Dr. Dysart may testify to the general principles and scientific findings involved in the post-event and co-witness contamination . . . ."). That is exactly what Dr. Cutler has proposed here.

As he explained, "the purpose of the report and my involvement is to educate, and I think it's important to provide context for why eyewitnesses make identifications in the first place. I

think its counterintuitive to consider that an eyewitness identification might be based on something other than memory. So I explain it." Ex. 1 (Cutler Dep. 9.1.20) at 268:10-16; *see also id*. at 268:4-6 ("And it's normally not my role to comment on what's specifically—what mental process the witness engaged in."); *id*. at 41:16-24: ("I normally review the materials and glean from the materials what the witness claims to have seen and analyze the conditions under which the witness saw the crime and what the witness claims to have seen or learned since then. But I don't offer opinions about specifically what the witness saw or thought, and certainly not about the accuracy of what the witness – witness identification or witness recollection of an event."). To that end, Dr. Cutler opines on a number of factors that could have "possibl[y]" impacted Mr. Bob's and Ms. Cage's identifications but is careful not to comment that either of their identifications are inaccurate or wrong. That "hypothetical explanation of the possible . . . causes" of their identifications are relevant and reliable. *Smith*, 215 F.3d at 718-19; *see also Cage*, 979 F. Supp. 2d at 842 ("Dr. Cutler's testimony will allow the jury to learn what the science of human memory and eyewitness has to say about Zilinger's testimony and thus help assess whether Zillinger's reflections of what caused her to pinpoint Cage are correct.").

Indeed, it is no different in kind than the coerced confession testimony of Dr. Russano that this Court has already approved. For example, with respect to Dr. Russano's reliability analysis, this Court permitted Dr. Russano to testify about "what sorts of considerations render post-admissions narratives reliable . . ." Doc. 589 at 33. That is, Dr. Russano can provide the jury with a framework for how to conduct their own reliability analysis. *Id*. So too here: Dr. Cutler can provide the jury with the factors that might have impacted the identifications of Plaintiffs and the car.

**B. Dr. Cutler's Opinions About Confirmation Bias Are Not Based on Speculation**

The Defendants fare no better in their specific attacks on the factors that Dr. Cutler discusses. The Defendants argue that Dr. Cutler has no factual foundation for his opinion about confirmation bias, citing to a portion of Dr. Cutler's deposition where he was asked whether Mr. Bob or Ms. Cage were susceptible to confirmation bias ("I don't know"); and whether he saw any evidence that they were susceptible to confirmation bias ("No."). Ex. 1 at 316:9-15. The problem for the Defendants is that the confirmation bias that Dr. Cutler discusses in his report, and that he will testify about at trial, is not confirmation bias of Mr. Bob or Ms. Cage, but instead of Defendants Lenihan and Ryan who conducted the photo identification procedures that Mr. Bob and Ms. Cage participated in. Ex. 2 (Cutler Report) at ¶35. As Dr. Cutler explains, "[c]onfirmation bias refers to a well-established psychological tendency to seek confirming rather than disconfirming information when testing one's theories, hypotheses, or ideas." *Id*. In Plaintiffs' case, "the use of a single photo rather than a photo array represents an attempt to test for confirming (as opposed to disconfirming[)] information." *Id*. That confirmation bias was exacerbated by "[t]he pairing of the plaintiffs' photos with a photo of the car known to be associated with the murder," which "conveys to the eyewitness that the detectives believe the photographed individuals to be involved in the murder" and because the "procedure lacked the features that would discourage confirmation bias, such as cautionary instructions, fillers and independent administration." *Id*. On this point, the defendants' expert, Dr. John Wixted, agrees: He testified that the fact that the photograph of the car had a police officer in it "would make it more likely that the person would say that's the car I saw compared to that's not the car I saw." Ex. 3 (Wixted Dep.) at 211:14-24.

As a result, and as even the Defendants' expert agrees, there is an adequate factual foundation for Dr. Cutler's opinions. Stated different, explaining to the jury how confirmation bias might have impacted the identifications here is not speculative.

### C. Dr. Cutler's Opinions on Contamination and the Commitment Effect Are Reliable

Additionally, the Defendants argue that Dr. Cutler's opinions contamination and the commitment effect are not reliable because the research supporting those opinions is based on stranger identifications and Mr. Bob's and Ms. Cage's identifications were of known persons—Tyrone Hood and Wayne Washington. This too lacks merit.

To start, there is evidence in the record that the identifications of Plaintiffs were not known-person identifications. In particular, although Mr. Bob alleged that he knew both Plaintiffs from the neighborhood, both Mr. Hood and Mr. Washington deny knowing Mr. Bob. Ex. 4 (Hood Dep. Vol. 1) at 293:4-8; Ex. 5 (Washington Dep.) at 129:2-15; Ex 6 (Washington Dep. Vol II) at 477:22-478:3. Similarly, Ms. Cage testified that she did not know either Mr. Hood or Mr. Washington. Ex. 7 (Cage Dep.) at 21:14-22:9. If that evidence is credited, then the identifications that Mr. Bob and Ms. Cage were of strangers.

Defendants are free to cross-examine Dr. Cutler on the facts that he credited, but that is not a basis to exclude his opinion. *See Cage*, 979 F. Supp. 2d at 810-11. Indeed, it is well-established that experts are permitted to rely on competing versions of the facts. *Id.*

Even if that were not the case, however, the Defendant argument fails. According to the Defendants, there is no scientific support for the proposition that contamination and commitment effects can affect known-person identifications. That is simply wrong. Ex. 1 at 179:1-9 (explaining that the scientific paper he cited talks "about the general problem of contamination of memory. So it would apply to known or unknown."); *id*. at 193:1-4 (field studies include cases of

identification of known others); *id*. at 194:1-6, 196:9-199:10 (discussing his article in *Champion* and Dr. Loftus' research on identification of celebrities). Indeed, even the Defendants' own expert agrees that contamination can happen for known person identifications. Ex. 3 (Wixted Dep.) at 99:11-21, 103:24-104:20, 109:1-6, 224:2-225:11. Thus, Defendants' argument fails.

### D. Dr. Cutler's Opinions About Showing the Witnesses a Photograph of the Car with a Police Officer in the Photograph is Reliable

Finally, the Defendants argue that Dr. Cutler's opinion that the Defendants should have conducted a photo array with the victim's car should be barred. In Defendants' view, because there is no claim based on the suggestive identification of the car and Dr. Cutler does not identify any professional standards demonstrating that a photo array was required, this opinion should be barred. Doc. 604 at 6-7. Neither objection has merit.

As an initial matter, Defendants have recharacterized Dr. Cutler's actual opinion, creating a strawman of their own making. As it relates to the car, Dr. Cutler has offered two opinions: (1) that "[t]he pairing of the plaintiffs' photos with a photo of the car known to be associated with the murder conveys to the eyewitness that the detectives believe the photographed individuals to be involved in the murder;" and (2) that showing witness Joe West a photograph of the victim's car before taking him to the pound to identify the victim's car (and doing the same with Mr. Washington) was inherently suggestive. Ex. 2 at ¶¶ 35, 39-41. As explained more fully in Section I above, an expert's testimony does not have to be the subject of any claim to be relevant and admissible; it need only assist the jury decide *any* issue in the case. *See Smith*, 215 F.3d at 718; *Cage*, 979 F. Supp. 2d at 843. Just as is true for Mr. Bob's and Ms. Cage's alleged identifications of Plaintiffs, their identifications of the car relate to the determination of whether Plaintiffs are innocent of the crime—and in turn, what damages they are entitled to. *See Parish v*, 702 F.3d at 999-1001; *Jones*, 514 F. Supp. 3d at 863-64. Defendants' argument fails.

Additionally, it is unclear what the Defendants mean in arguing that Dr. Cutler fails to relate his opinion to any professional standards. Defendants cite *Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) for that proposition, but *Jimenez* does not hold that an opinion on eyewitness identification has to identify professional standards to be admissible; instead, *Jimenez* explained that identifying professional standards and the deviation from them can be relevant to demonstrate a defendant's (in that case, police officer's) intent. *Id*. at 721-22. Regardless, Dr. Cutler did identify the appropriate standards and scientific basis for his opinion: Based on research in the field, he explained that "showups were inferior identification procedures for both persons and objects" and that forensic-object lineups led to "fewer false car identifications (14%) . . . than did forensic-object showups (61% for false car identifications[)]." Ex. 2 at ¶39.

III.     **Dr. Cutler's Opinions on Impoverished Viewing Conditions are Reliable**

The Defendants are also seeking to bar Dr. Cutler's opinions about the potential impact of impoverished viewing conditions on the identifications in this case. The Defendants make two arguments on this score: first, that the opinions are unreliable because Dr. Cutler does not know what the viewing conditions were and second, because the identifications of Plaintiffs were allegedly known-person identifications, viewing conditions do not matter. Both are unavailing.

A.  **Dr. Cutler Based His Opinions About Impoverished Viewing Conditions on Facts in the Record**

First, the Defendants argue that Dr. Cutler's opinions about impoverished viewing conditions should be barred because they are based on speculation; that is, that Dr. Cutler does not actually know what the viewing conditions are. But the Defendants have missed the mark: The issue is not that Dr. Cutler does not know what the viewing conditions were, it is that Mr. Bob has changed his testimony so many times on nearly every related issue that it would be impossible for Dr. Cutler to definitively state one way or another what those conditions were.

Instead, Dr. Cutler has tried to account for that varied testimony and has provided the jury with a framework so that once it decides which version (if any) of Mr. Bob's to credit, it can assess whether any of these factors may have impacted his identifications.

The Defendants identify three viewing conditions which they allege Dr. Cutler does not have a factual foundation to opine on: the viewing distance from the car to Mr. Bob's second-story window; whether Mr. Bob was distracted; and whether Mr. Bob (or anyone else) was drinking. Doc. 604 at 7-8.[1] But in none of these examples did Dr. Cutler say he did not have a factual foundation to opine on. For example, as to viewing distance, Dr. Cutler testified that there was a dispute in the record about the distance at which Mr. Bob allegedly viewed Plaintiffs and the car because Mr. Bob had given conflicting testimony, saying at Plaintiff Washington's trial and his deposition that the car pulled up on the opposite side of the street (making the distance between himself and the car longer) while saying at Plaintiff Hood's trial that the car pulled up on the same side of the street as his house. Ex. 1 (Cutler Dep. 9/1/20) at 293:5-294:6. As Dr. Cutler explained, "I tried to account for it by using estimates if he was on the close side of the street or on the far side of the street," providing a range of 59 to 97 feet. Ex. 1 (Cutler Dep. 9/1/20) at 293:19-21; Ex. 2 at ¶23.

Similarly, while Dr. Cutler testified that he had "no direct knowledge of [Mr. Bob's] level of attention and distraction," he "tried to gather the relevant information and reproduce it here." Ex. 1 (Cutler Dep. 9/1/20) at 307:13-16. That included Mr. Bob's testimony that on the

---

[1] The Defendants also state that Dr. Cutler has no knowledge about whether Mr. Bob was exposed to news stories which contaminated his memory. Contamination is not a viewing condition, but regardless there is ample evidence in the record that Mr. Bob was exposed to television and print news stories that (a) identified Plaintiffs by name and picture as having been charged with the murder; (b) that indicated that "they had [Mr. Hood's] fingerprints;" (c) that identified the victim's car by photograph, and stated that the victim was found murdered in his car. Ex. 8 (Bob Test., *People v. Hood*) at G77-78, G108-09, 124-25; Ex. 9 (Bob Test., *People v. Washington*) at 107-09, 125-27, 129. That Dr. Cutler cannot divine from this exposure what exactly contaminated Mr. Bob's memory does not mean there is no adequate factual foundation for Dr. Cutler's opinion.

night in question, he was upstairs in his bedroom "watching the television, listening [*sic*] whatever car was going to come up." Ex. 9 (Bob Test., *People v. Washington*) at 99:15-19. When the victim's car allegedly pulled up, Mr. Bob was watching a movie in bed and "just raised [his] head up in the bed, raised [his] head up and looked down." *Id*. at 121:10-12, 19-22; *see also* Ex. 2 at ¶ 27. Mr. Bob's testimony provides a sufficient factual foundation that he may have been distracted when he allegedly witnessed Plaintiffs and the car.

Finally, Dr. Cutler has ample evidence from which to opine about alcohol intoxication. Ex. 2 at ¶28. Although Mr. Bob testified at Plaintiffs' criminal trials that he was not drinking on Mother's Day, at his deposition, he indicated that during this time period, he was an alcoholic and he would drink every single day, which would include Mother's Day 1993. Ex. 10 (Bob Dep.) at 35:21-23 (drinking every night while working at Amerail). Likewise, Ms. Cage testified that she too was an alcoholic, that she would have been drinking on Mother's Day (as would have Mr. Bob) and that she was drunk when the police came to speak with her in 1996 about Plaintiffs. Ex. 7 (Cage Dep.) at 40:22-41:11; *see also* Ex. 2 at ¶28. As such, a jury can decide to credit this testimony—and disregard Mr. Bob's self-serving testimony at Plaintiffs' criminal trials that the one night he did not drink was the night he happened to see Plaintiffs. If a jury were to do so, then Dr. Cutler's explanation of how intoxication might affect memory will be useful to the trier of fact in evaluating the witnesses' identifications of Plaintiffs and the victim's car.

## B.  There is a Scientific Foundation for Dr. Cutler's Opinions

Second, the Defendants argue that there is no scientific research or foundation for whether these impoverished viewing conditions—alternately, referred to as estimator variables— would impact known-person identifications. This argument fails at the starting gate.

As described above, there is ample evidence in the record that these identifications are stranger identifications, mooting Defendants' argument entirely. *See* Section II, *supra*. But even if that were not the case, there is research that demonstrates that estimator variables impact known identifications. On this score, even the Defendants' expert agrees—he just believes the impact is less than for stranger identifications. Ex. 3 (Wixted Dep.) at 190:7-194:16.

As for research, Dr. Cutler cites—and discusses—studies done by Dr. Loftus on celebrity identifications. Ex. 2 at ¶23. The Defendants complain that Dr. Cutler does not articulate how this research relates to the identifications here, but even a cursory perusal of his report belies that statement. Dr. Cutler explains that familiar person identifications can be impacted by impoverished viewing conditions, including the distance from which a witness viewed that familiar person. In the Loftus study of celebrities—"who were chosen because they were recognizable"—at "77 feet, the accuracy rate was about 34%" and "[a]t 110 feet, the accuracy rate fell to 0%." *Id*. That study helps demonstrate that the viewing distances at which Mr. Bob and Ms. Cage allegedly saw Plaintiffs and the car—somewhere between 59 and 97 feet—could "significantly interfere with [their] ability to perceive" Plaintiffs' faces, even if they were familiar to them (which they were not). *Id*.

**IV.  Dr. Cutler's Opinions on Inference Processing are Relevant**

Defendants make two arguments for why Dr. Cutler's opinion about inference processing should be barred: (1) because Dr. Cutler cannot say definitively whether or not Mr. Bob and Ms. Cage used inference processing in their identifications; and (2) because there is no relevant research on inference processing in the context of known-person identifications. Neither of those objections have merit.

First, Dr. Cutler cannot say whether or not Mr. Bob or Ms. Cage used inference processing to make their identifications; to do so, he would have to opine on the mental state and mental processing of these third-party witnesses. Ex. 1 (Cutler Dep. 9/1/20) at 268:2-6. And were he to do so, the Defendants would surely be complaining that he was offering an impermissible state-of-mind opinion. *See United States v. Northrup Grumman Sys. Corp.*, 2015 WL 5916871, at *5 (N.D. Ill. Oct. 8, 2015) (impermissible to opine on state of mind). He can, however, explain the framework for inference processing to the jury and the jury can decide whether that is the mechanism by which the witnesses identified Plaintiffs.

Indeed, on that score, Dr. Cutler has identified facts in the record that suggest that Mr. Bob's and Ms. Cage's identifications were not spontaneous, but instead the result of inference. For example, Dr. Cutler explained at his deposition that there was testimony from one of the Defendants (Lenihan) and a contemporaneous police report indicating that Mr. Bob "was listening in on the –or at least heard the conversation between the officer and Brenda Cage." Ex. 1 (Cutler Dep. 9/1/20) at 272:18-23; *see also* Ex. 11 (Lenihan Dep). at 318:13-319:8 (Bob was listening in before he interjected; already "were into the conversation about Mother's Day"); Ex. 12 (3/25/96 Supp. Report) at 4 ("While R/Ds were interviewing Brenda Cage, a gentleman walked into the room *and started listening to the conversation . . .*") (emphasis added).

Second, the Defendants argue that Dr. Cutler's opinions should be barred because inference processing is more relevant to stranger identifications. Of course, that argument presumes that the identifications here were not stranger identifications, a presumption rebutted by evidence in the record that Dr. Cutler was entitled to credit. But regardless, there is research on known-person identifications, which Dr. Cutler described in his deposition and report. Ex. 1 (Cutler Dep. 9/1/20) at 275:22-278:6; Ex. 2 at ¶¶11-22. Defendants complain that much of this

research relates to lineups—which did not occur here—but that misses the mark. What Dr. Cutler has explained is that lineups, when they include appropriate fillers and administered properly, reduce the risk of identifications made based upon inference, instead of memory. In other words, had the Defendants wanted to reduce the risk of Mr. Bob or Ms. Cage identifying the Plaintiffs (and the car) by way of elimination, they could have included fillers and conducted a photographic lineup. Indeed, Defendant Ryan indicated that he had seven or eight photographs of black males to show Mr. Bob and Ms. Cage—he simply chose not to use them. Ex. 13 (Ryan Test., *People v. Hood*) at J-64:6-J-65:16; Ex. 14 (Ryan Dep. Vol. 2) at 237:3-240:6.

Finally, the Defendants complain about Dr. Cutler's opinion that proper identification procedures are necessary even when a witness may have familiarity with the suspect because of transference; that is, the witness may mistakenly identify someone because they are familiar. Doc. 604 at 10. The Defendants argue that this theory "strains credulity on its face," but their own expert agrees with it, and it has support in the literature. Ex. 3 (Wixted Dep.) at 225:6-11; Ex 2 (Cutler Report) at ¶¶ 36-37 (citing to a 2006 article by Deffenbacher, et. al.). Nor are the Defendants more successful claiming that this opinion is unreliable because Dr. Cutler cannot identify the familiarity that the witnesses had with the Plaintiffs. Neither can the Defendants' own expert, Dr. Wixted. Ex. 3 (Wixted Dep.) at 218:16-219:10 (explaining he should not have picked a category of familiarity because "I can't really know that"). Indeed, it is up to the jury to decide whether to credit Plaintiffs testimony, and assume that Mr. Bob did not know Plaintiffs, or to credit Mr. Bob's various testimony about how well he knew Plaintiffs.

## V. Dr. Cutler Can Testify About the Length of Time Between the Alleged Sightings and Identifications

Dr. Cutler opined that the length of time between the alleged sighting—Mother's Day 1993—and the identifications—March 24, 1996—would have potentially impacted the

witnesses' ability to remember and properly identify the Plaintiffs and the victim's car. Ex. 2 at ¶¶ C, D, 30. That is not only because of the lengthy retention interval, but also because the viewing conditions under which the witnesses allegedly saw the Plaintiffs "would make it extremely difficult to make an accurate, real-time identification and retain it in memory for three years" and because in the three years, there was opportunity for "intervening events to influence the eyewitnesses' memories." Ex. 2 at ¶¶ C, D, 30. The Defendants argue that this opinion should be barred for two reasons: First, because it is "obvious" and second, because Dr. Cutler cannot say whether Mr. Bob was actually influenced by either prior news reports or the conversation he overheard with the Defendants having with Ms. Cage. Neither argument has merit.

First, "[i]f there is one thing known about eyewitness identification, it is that 'common sense' misleads more often than it helps." *U.S. v. Williams*, 522 F.3d 809, 811 (7th Cir, 2008); *See Phillips v. Allen*, 668 F.3d 912, 916 (7th Cir. 2012) ("[N]othing is obvious about the psychology of eyewitness identification . . . Lawyers' talk is no substitute for data."). As such, it is not "obvious" that the retention interval here—three years from sighting to identification—would impair the ability of witnesses to make identifications. Indeed, Dr. Wixted has called this proposition into question, stating that for stranger identifications accuracy can remain high at nine-months and testifying that for known-person identifications it likely remains high even longer. Ex. 3 (Wixted Dep.) at 181:3-183:8.

Second, although Dr. Cutler cannot testify that either Mr. Bob or Ms. Cage were definitively influenced by news media, he can explain to the jury how that media might have contaminated their memories, particularly because there is ample evidence in the record—from Mr. Bob himself—that he viewed and learned information from such programming. To that end,

14

Mr. Bob has testified that he saw print and television news reports that: (a) identified Plaintiffs by name and picture as having been charged with the murder; (b) that indicated that "they had [Mr. Hood's] fingerprints;" (c) that identified the victim's car by photograph and stated that the victim was found murdered in his car. Ex. 8 (Bob Test., *People v. Hood*) at G77-78, G108-09, 124-25; Ex. 9 (Bob Test., *People v. Washington*) at 107-09, 125-27, 129. Dr. Cutler's framework for how that media might have impacted the eyewitnesses is relevant and admissible. *See Smith.*, 215 F.3d at 718; *Cage*, 979 F. Supp. at 843; *Sanders*, 2016 WL 2866097, at *4 & 8.

Similarly, although the Defendants argue there is no evidence that Mr. Bob overheard a conversation between the Defendants and Ms. Cage before he made his identification, Defendant Lenihan *himself* testified to this and wrote to the same effect in his supplementary report. Ex. 11 (Lenihan Dep.) at 318:13-319:8 (Bob was listening in before he interjected; already "were into the conversation about Mother's Day"); *id*. at 329:13-17 ("[I]t would have had to have been after that because we had the pictures of the car on the table. So it would have had to have been after she stated that she saw Tyrone drive up in a car and we showed her pictures of the car."); Ex. 10 (Bob Dep.) at 67:20-68:14; Ex. X (3/25/96 Supp. Report) at 4 ("While R/Ds were interviewing Brenda Cage, a gentleman walked into the room *and started listening to the conversation . . . .*") (emphasis added). The Defendants are free to cross-examine Dr. Cutler on his opinion, but there is a sufficient factual basis for it. *See Cage*, 979 F. Supp. 2d at 810-11 (experts can rely on different facts and factual disputes must be resolved by the jury).

## VI.    Dr. Cutler's Opinions About Confidence Level Are Supported by the Research

Defendants seek to bar Dr. Cutler from opining that a witness's confidence in his or her identification is only indicative of accuracy in limited circumstances—under "pristine conditions" and when confidence is measured at the first identification test. It is unclear what the

Defendants' argument is on this score; their own expert agrees. Ex. 3 (Wixted Dep.) at 117:23-119:13, 119:20-120:22. According to the Defendants, these opinions "lack the appropriate fit" to this case. Doc. 604, at 12. Plaintiffs largely agree, having moved to bar Dr. Wixted from opining on the same matter, with one caveat: Should either Mr. Bob or Ms. Cage testify that they are highly confident in their identification at trial, Plaintiffs would seek to introduce Dr. Cutler's testimony to explain that the research has *only* proven that high confidence correlates with high accuracy in conditions that are wholly absent from this case—(a) a lineup with at least five fillers; (b) one suspect per lineup; (c) the suspect cannot stand out; (d) the police must provide cautionary instructions that the suspect may not be in the lineup; (e) the lineup is administered double-blind; and (f) confidence is recorded at the time of the lineup. Ex. 3 (Wixted Dep.) at 119:20-120:22; *see also id*. at 149:11-150:7 (explaining that he cannot say in this case that Mr. Bob's or Ms. Cage's identifications were made with high confidence because the conditions necessary for that determination are not present).[2]

## VII.    Dr. Cutler's Rebuttal Opinion is Admissible

Additionally, Defendants seek to bar Dr. Cutler's rebuttal opinion, citing to an alleged "gotcha" moment from Dr. Cutler's deposition where counsel got him to admit that he labeled his rebuttal opinion a "supplement" and he wished he had cited the research on known-person identifications in his original report. That argument fails.

---

[2] To the extent that the Defendants are arguing that they should be able to testify that an identification under less pristine conditions does not mean that that identification is inaccurate, there is no scientific proof for opining on that score. All that the research has demonstrated to date is that confidence is correlated with accuracy under pristine conditions—and research and scientific support is required for an expert opinion. Ex. 3 (Wixted Dep.) at 117:23-118:8; Fed. R. Evid. 702; *see also Chapman v. Maytag Corp.,* 297 F.3d 682, 688 (7th Cir. 2002) ("A very significant Daubert factor is whether the proffered scientific theory has been subjected to the scientific method.").

The mere fact that Dr. Cutler labeled his report a "supplement" and admitted that he could have cited a study in his original submission is "an issue of semantics. The fact that [Dr. Cutler] uttered the phrase ["supplement"] during his deposition does not take his opinion outside the purview of expert testimony." *Cage*, 979 F. Supp. 2d at 826. That is particularly so as the introduction to Dr. Cutler's rebuttal report expressly states that it is in response to the opinions issued by Dr. Wixted. Ex. 15 (Cutler Rebuttal) at 1. Indeed, the issue is not the particular word that Dr. Cutler used, but instead whether anything in Dr. Cutler's rebuttal report responds to the opinions that Dr. Wixted issued. *Cage v. City of Chicago*, No. 09 C 3078, 2012 WL 5557410, at *5 (N.D. Ill. Nov. 14, 2012) ("Here, Reich's declarations concerning the shortcomings of the CPL Report cover the same subject matter identified in Defendants' disclosures and therefore constitute proper rebuttal.").

Taking a step back, in his expert report, Dr. Wixted primarily offers two opinions: (1) known person identifications are highly accurate and (2) highly confident identifications are highly accurate when pristine conditions are present. Ex. 16 (Wixted Report) at 5-12. In contrast to Dr. Wixted's position, Dr. Cutler explained that "familiar identifications are not infallible;" "[f]amiliar identifications involving minimal prior exposure to the perpetrator may operate similarly to stranger identifications;" estimator variables impact the accuracy of identifications of familiar others; and external factors—such as contamination or a suggestive procedure—can also impact the identification of familiar others. Ex. 15 (Cutler Rebuttal) at 1-3. All of these opinions are directly responsive to Dr. Wixted's report, in which he argues that familiar identifications are highly accurate and resilient to estimator variables and external influence. Ex. 16 (Wixted Report) at 5-12. In other words, Dr. Cutler's rebuttal "covers the same subject matter identified

in Defendants disclosures and therefore constitute[s] proper rebuttal." *Cage*, 2012 WL 5557410, at *5.

Alternatively, the Defendants argue that Dr. Cutler's opinions are unreliable because he does not know: (a) if showing Mr. Bob and Ms. Cage a single photograph impacted them; (b) if Mr. Bob or Ms. Cage were able to see Plaintiffs' faces; (c) if Mr. Bob or Ms. Cage were subject to social pressures or contamination; (d) what the exact lighting conditions were; (e) and what the exposure time and intoxication were. Doc. 604, at 14. The majority of these arguments have already been addressed above: Dr. Cutler, as he explained, reviewed the materials and gathered the facts in the record. It is not his role to opine on whether something definitively impacted a witness; that would be akin to saying Mr. Bob or Ms. Cage were erroneous in their identifications, an opinion that is not permitted under the rules. Instead, Dr. Cutler reviewed the material and identified the factors that might be at play, which he explained in his report, and which he will explain to the jury to help them make a determination about whether Mr. Bob or Ms. Cage were erroneous. Ex. 2. Moreover, there is ample evidence in the record for each of the above-stated factual propositions—use of a single photograph, inability to see Plaintiffs' faces, exposure to news media, alcohol intake, distraction and brief duration of the sighting—which Dr. Cutler cited in his report and depositions. Exs. 1 & 2 Ex. As a result, the Defendants' argument fails.

## VIII.   Dr. Cutler's Report Should Not Be Barred Based on Rule 403

Finally, the Defendants argue that Dr. Cutler's expert testimony should be barred on the grounds that it is unduly prejudicial. The majority of this argument simply regurgitates what is stated above; that is, that it is prejudicial because there is no longer an unduly suggestive identification claim and confusing because Dr. Cutler cannot definitively state that any one factor

necessarily impacted the identifications. Neither of those arguments have merit. Given the Defendants' intention to present the identifications as evidence of Plaintiffs' guilt, it would actually be unduly prejudicial to Plaintiffs were they not permitted to present expert testimony to rebut them and explain how Mr. Bob and Ms. Cage came to identify two people who are innocent of the Morgan, Jr. murder. *Sanders v. City of Chicago Height*s, No. 13 C 0221, 2016 WL 1730608, at *11 (N.D. Ill. May 2, 2016); *Sander*s, 2016 WL 2866097 at **7-9. Likewise, the mere fact that Dr. Cutler cannot opine on Mr. Bob's or Ms. Cage's state-of-mind—that is, what made them choose Plaintiffs and the victim's car—is not a basis for exclusion under Rule 403. Rather, this type of expert testimony is repeatedly admitted. *Id.*

The only other argument that the Defendants make is that if Dr. Cutler were permitted to testify, "the jury may improperly conclude, based on his purported expertise, that the that the witnesses are not credible." Doc. 604 at 15. This argument borders on the nonsensical: Dr. Cutler is not making any credibility determinations—in fact, according to the Defendants, he is not making any assessments about the accuracy of the identifications or the reliability of the witnesses. *See Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 3988593, at *6 (N.D. Ill. Aug. 30, 2022) ("That is not a fair characterization of Dr. Loftus's opinions. At no point does he invade the province of the jury by, for example, injecting his personal views about whether certain testimony is believable and he makes no comment as to whether any witness in this case has embellished their testimony.").

## Conclusion

For all the reasons stated herein, the Defendants' motion should be denied.

Respectfully submitted,

**WAYNE WASHINGTON**                    **TYRONE HOOD**

*/s/ Steven Greenberg*                  */s/Gayle Horn*
*One of Plaintiff Washington's Attorneys*   *One of Plaintiff Hood's Attorneys*

Steven Greenberg                        Jon Loevy
Attorney and Counselor                  Gayle Horn
53 W. Jackson Blvd. Ste. 1260           Heather Lewis Donnell
Chicago, IL. 60604                      LOEVY & LOEVY
(312) 879-9500                          311 N. Aberdeen Street
                                        Chicago, Illinois 60607
                                        (312) 339-8112


Steven H. Fine
Law Office of Steven H. Fine
53 W. Jackson, Suite 1260
Chicago, Illinois